# NO. 23-1070

No. 19-CV-05549 (SDNY)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT
--------------------------------------------------------------

UNITED STATES OF AMERICA,
                            *Plaintiff-Appellee,*
V.

CAROLYN BUFF,
                            *Defendant-Appellant,*

On Appeal from the United States District Court
for the Southern District of New York

## DEFENDANT-APPELLANT'S REPLY BRIEF

Carolyn Buff
126 Avenue Foch
59700 Marcq-en-Baroeul
FRANCE
carolynjbuff@yahoo.com
+33 7 84 59 90 40

i

## TABLE OF CONTENTS-BRIEF IN REPLY

General Introduction

Argument……………………………………………………………1

A) Issues conceded by the Government in its Brief………………...1

   i)         Issues presented for review i and ii………………………1

   ii)        Issues presented for review iii……………………………2


B) Summary Judgement……………………………………………4

   i)         Preponderance of the evidence……………………………4

   ii)        Waiver of Appeal Order to Compel………………………5

   iii)       The Government's misleading procedural history………...8

   iv)       My Cross-Motion for relief pursuant to FRCP 60 (b)……..9

   v)         The Hague Convention: error of law or of discretion…….10

   vi)       US Law on taking depositions abroad……………………11

   vii)      *Bittner* on FBARs and tax………………………………...12

   viii)     The French Blocking Statute………………………………13

   ix)       Reasonable cause defenses………………………………..15

   x)         Preclusion of defenses……………………………………17


C) Service……………………………………………………………24

D) Privacy……………………………………………………………27

E) Certificate of Compliance………………………………………..30

# TABLE OF AUTHORITIES

- *Bernstein v. Bernstein Litowitz Berger & Grossmann Litowitz Berger & Grossmann* LLP, 814 F.3d 132, 139 (2d Cir. 2016)……..28

- *Bittner v. United States,* 598 U.S. 85, 95 (2023)……………………………………………….2, 10,12, 15-17

- *Buon v. Spindler,* 65 F.4th 64, 74…………………………………………………………….25

- *Caidor v. Onondaga Cnty.,* 517 F.3d 601, 605 (2d Cir. 2008)………………………………….6-7

- *Funk v. Belneftekhim,* 861 F.3d 354, 368 (2d Cir. 2017)………………………………….23

- *Gambale v. Deutsche Bank AG,* 377 F.3d 133, 144 (2d Cir. 2004)………………………………….28

- *In re Glob. Power Equip. Grp. Inc.,* 418 B.R. 833, 849 (D. Del. 2009)………………………………….13

- *In re Nortel Networks Corp. Sec. Litig.,* 539 F.3d 129, 132 (2d Cir. 2008)………………………………….6

- *Mendu v. United States,* 153 Fed. Cl. 357, 365 (2021)…………….9, 12,

- *Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc.,* 970 F.3d 133, 146 (2d Cir. 2020)………………………………….24

- *Motorola Credit Corp. v. Uzan,* 73 F. Supp. 3d 397, 403 (S.D.N.Y. 2014)…………………………………13

- *Nationale Industrielle Aérospatiale v. United States District Court for the Southern District of Iowa,* 482 U.S. 522 (1987)………….....2, 11, 13,

- *Schooner Exchange v. McFaddon*,
  11 U.S. 116 (1812)…………………………………………………2, 12

- *Tracy v. Freshwater*
  [623 F.3d 90 (2d Cir. 2010)]……………………………………..7, 26

- *United States v. Boyle,*
  *469 U.S. 241, (1985)…………………………………………….*16

- *United States v. Sineneng-Smith*
  (590 U.S___, 2020)……………………………………………..19

- *Wood v. Milyard, Warden et al*,
  132 S. Ct. 1826 (2012)……………………………………………1, 15

Statutes:
- Fed.R.Civ.P 37 …………………………………………………5, 22

- Fed.R.Civ.P 60…………………………………………………..9-10


Foreign Statutes
- French Law No. 68-678 of July 26, 1968………………………….. 13-14

- Regulation (EU) 2016/679………………………………………... 21, 29
  of the European Parliament and of the Council
  of 27 April 2016

  - Articles 226-13 and 226-14 of the French penal code…………..29

# I.    GENERAL INTRODUCTION

1. I filed my Brief on Appeal on January 9, 2024 ("my Brief", App. Dkt. 50). On March 27, 2024, the Government filed its "Brief for Plaintiff-Appellee" ("Response, App. Dkt No. 62).

2. As will be detailed below, in its Response, the Government raises issues on appeal for the first time [*Wood v. Milyard, Warden, et al*, 132 S. Ct. 1826 (2012): "It is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal"]; misrepresents legal submissions and decisions by the District Court; fabricates facts while omitting others; and seeks to muddy waters on even the most straightforward of issues.

3. At the same time, the Government has failed in all its submissions, including the Complaint against me, to mention that it long ago concluded has that my late Foreign Bank Account Report (FBAR) filings were non-willful.

## II.    ARGUMENT

### A. ISSUES CONCEDED BY THE GOVERNMENT IN ITS BRIEF

i)    Issues Presented for Review i and ii

1. In its Brief, the Government makes a number of critical concessions. With respect to the first question I presented for review- -[d]id the Court err in law in concluding that Foreign Bank Account Reporting requirements constitute a tax

or administrative matters, rather than a civil matters, in US Law – the Government, citing *Bittner v. United States*, 598 U.S. 85, 95 (2023) accepts for the first time in these proceedings that FBARs do not constitute tax matters (Response, p. 45).

2.  Apart from a general assertion that "the district court… properly ruled in favor of the government on all pending motions and entered judgment against" me (Response, p. 13), the Government did not address my submissions regarding the second question for review- did the District Court err in failing to grant relief pursuant to Rule Fed.R.Civ.P 60(b)(3) on the basis of "misrepresentation by the opposing party." The Government's silence on this matter indicates that the answer to that question is also "yes."

   ii)   <u>Issue Presented for Review iii</u>

3.  The Government also failed to address the third question for review – [d]id the District Court err in neglecting to address Fed.R.Civ.P 28 (b) (1) and other relevant US law addressing the sovereignty of foreign nations ? As set out in my Brief (pp. 10, 25-28, paras. 22, 62-66), according to Fed.R.Civ.P 28 (b) (1), the Supreme Court of the United States in *Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812) and in *Nationale Industrielle Aérospatiale v. United States District Court for the Southern District of Iowa,* 482 U.S. 522 (1987), and the Department of Justice's own rules, the Government's efforts to depose me in France/Belgium

without the prior consent of the relevant domestic authorities was unlawful under US law, in addition to European law. The Government's silence on this issue on appeal replicates its silence on the matter before the District Court. Thus, the only reasonable inference is that it accepts that its failure to contact the French authorities prior to my deposition in France constituted a violation of US law.

4. This violation distinguishes this case from every other case on the preclusion of defenses cited by the Government for failure to comply with a court order. One might argue that in her Order to Compel, the Magistrate-Judge did not specifically direct the Government to proceed with the deposition without prior consultation with the French authorities. But the Order to Compel was issued a week after the close of the discovery schedule set a year earlier, and thus proceeding with the deposition in accordance with US law would have required an extension of several months. Instead, by granting a very short extension to the Government to take the deposition, the Magistrate-Judge effectively green lit the Government's unlawful approach.

5. As detailed in my Brief, I might have suffered no consequences from complying with this Order despite its violation of US law in the United States, but I am a French citizen residing in France and am bound by French and European law, including those with extra-territorial reach (pp. 7-10, paras. 11-15, pp. 22-24, paras. 53-58). And, at the risk of repeating myself, all unlawfulness would have

3

been obviated by proceeding in accordance with the Hague Convention as originally agreed by both parties.

6. In sum, to my knowledge, the consequences of failing to comply with a U.S court order that is unlawful, under US law, is a matter of first impression. In the circumstances, the preclusion of defenses cannot be a "just" response or remedy. Finally on this point, the circumvention of US law by the Government for purposes of convenience must not be sanctioned directly, or indirectly, by this Court.

### B. SUMMARY JUDGEMENT

#### i. The Government on the Preponderance of the Evidence

7. The Government claims that "[I do] not dispute any of the material facts establishing that [I] violated the Bank Secrecy Act and that [I] had no reasonable cause for doing so", and that "in [my] opening brief on appeal, I do "not contest the district court's holding that the government proved its affirmative case under the Bank Secrecy Act" and that, in any case, the Government has proven its case against me by a preponderance of the evidence (Response, pp. 14, and 37-39). This is undiluted nonsense. It is not in dispute that the Bank Secrecy Law Act specifically establishes a reasonable cause exception to the imposition of penalties at 31 U.S. Code § 5321 (a)(5)(B) (iii), and in my Brief, I discussed at length the District Court's Order stripping me of my right to establish reasonable

cause.[1]  If an accused were found guilty beyond a reasonable doubt of a crime even though s/he had been deprived of his/her right to present a defense, including compelling alibi evidence (evidence that the Government had long been aware of),s the verdict would not withstand appellate scrutiny. The fundamental right to present a defense should only be denied, if at all, in the most extraordinary circumstances, which are not present in this case. And indeed, I believe a case could be made that FRCP 37(b)(2)(A)(vi), permitting the rendering of default judgements, is consistent with the seventh amendment of the Constitution.

### ii.  Waiver of challenge to Magistrate-Judge's Order to Compel

8. The Government contends that "[I]waived [my] right to challenge the magistrate judge's order compelling [my] deposition when [I] failed to object to the district court." (Response, pp. 42-43).

9. This contention fails for five reasons. First, Judge Daniel's relied on the Magistrate-Judge's Order to Compel in his subsequent dispositive Order (see, *inter alia*, S-A: 27, including ftn 4; and S-A 30, including ftn. 7), meaning that the Order to Compel my deposition and the Order granting Summary Judgement to the Government are inextricably linked (see, *Caidor*, infra). Second, the Government failed to cite Rule 72 (a) in response to my Objections to the

---

[1] See, my Brief, inter alia, paras. 3-4, 11-12, 23-24, 38, 42, 45, 70-93.

Magistrate's Report and Recommendations in which I cited the Order to Compel extensively (A: 228-231), meaning that it waived or forfeited its right to do so on appeal [See, *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008)]. Third, the Government relied extensively on the Magistrate-Judge's Order in its Response.[2] Fourth, I challenged the Magistrate-Judge's Order compelling my deposition in a motion for reconsideration of the order (ECF #135) which the Magistrate-Judge denied (ECF #168) the day before she issued the Report and Recommendations recommending that the Court grant summary motion in the Government's favor (ECF #168). And fifth, the Government cites *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 605 (2d Cir. 2008) misleadingly.

10. On the last point, the *Caidor* Court distinguished between decisions on dispositive matters and decisions on other matters. With respect to the former, it reaffirmed that "[i]t is settled law that a pro se litigant's failure to object to a magistrate judge's decision on a dispositive matter does not effect a waiver of appellate review absent an express warning from the magistrate judge" - which the Magistrate-Judge in this case did not provide in her Order to Compel my deposition.   Additionally, in contrast to my motion on privacy matters, for example, the Magistrate-Judge's motion to compel was the basis for the dispositive Order on Summary Judgement. In any event, even with respect to

---

[2] See, *inter alia*, pp. 14, 28-29, 44-49; 52-54, 61)

non-dispositive matters, this Court in *Caidor* wrote that "we have discretion to consider waived arguments… For instance, [w]e have exercised this discretion where necessary to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional fact-finding."

11. As set out in my Brief, the Magistrate-Judge's determination - subsequently relied on by Judge Daniels (S-A: 30, ftn. 7) - that FBARs are taxes constituted an error of law. Further, and as discussed in more detail elsewhere, the Magistrate-Judge failed to address the impact of her Order to Compel on FRCP 28 (b) (1) and other US law. Both errors of law require no additional fact-finding and the result was a manifest injustice. Thus, even had the Government not waived its right to address this issue on appeal, I believe this Court's exercise of its discretion to address the legal matters I purportedly waived is warranted in this case.

12. Finally on this issue, I recall this Court's determination on the special solicitude that Courts are ordinarily obligated to afford pro se litigants in *Tracy v. Freshwater* [623 F.3d 90 (2d Cir. 2010)]: "The rationale underlying this rule is that a pro se litigant generally lacks both legal training and experience, and, accordingly is likely to forfeit important rights through inadvertence if he is not afforded some degree of protection."

### iii. The Government's misleading summary of the procedural history

13. The Government misleadingly implies that during the period of October 2021 and May 2022, I deliberately moved back and forth from France to Belgium to avoid deposition in this case (see for example, Response, pp. 26-27). In fact, I informed the AUSA on the day of the first case management conference, October 12, 2021, that I had moved to Belgium (Dkt. No. 96, exhibit B as cited by the Magistrate-Judge, SPA: 34). The Magistrate-Judge later determined that at that time neither party was aware that Belgium was not a party to the Hague Convention (SPA: 34-35), and soon after I returned to France.

14. The Government further insinuates that I deliberately returned from Belgium to France to delay this case. This only underscores the Government's continuing failure to understand that the Hague Convention facilitates, rather than hinders, the transmission of information and evidence across international borders. The law applicable to the Government's effort to depose me in Belgium are articles 11 and 873 of the Belgian Judicial Code which require the establishment of a Rogatory Commission authorized by the Ministry of Justice prior to the taking evidence in Belgium by non-Belgian authorities or parties "unless stipulated otherwise by an international convention." https://hal.archives-ouvertes.fr/hal-02443833/document (as cited at A: 41 and 512-513.) It is my belief and understanding that the process of authorizing and establishing a rogatory

commission is relatively lengthy and thus my return to France could only have expedited the holding of the deposition.

15. Moreover, Brussels is a 30 minute and 20 euro/dollar train ride to the French border. Had the Government proceeded in accordance with Chapter I of the Hague Convention in France as agreed in the October 2021 Status Conference, even if I had remained in Belgium, I could not have reasonably argued that travelling from Belgium to France to be deposed constituted a burden or that the Government should start deposition procedures all over again in Belgium.

16. The Government further claims that I responded to the Government's effort to depose me in Belgium in violation of Belgian law "only by characterizing the government's email as 'a form of harassment.'" This is untrue; I told the AUSA I was disappointed that he would not engage in discussion about the applicable law and that for that reason I understood that he had only contacted me to discuss the deposition for *pro forma* reasons (ECF 74 #2).

### iv. My Cross-Motion for Relief pursuant to FRCP 60 (b)

17. As noted above, the Government has not addressed my request for relief pursuant to FRCP 60 (b)(3).

18. I recall that I referenced the Court of Claim's reasoned determination on the nature of FBARs in *Mendu v. United States,* 153 Fed. Cl. 357, 365 (2021) in a motion for reconsideration of the Order to Compel (ECF #137) and in my

summary judgement pleadings. The Government - which is indivisible – must have known that this issue would be addressed by the Supreme Court in *Bittner*. The Government's Reply to my Rule 60 Cross-Motion was filed after the Supreme Court's Judgement in *Bittner* was issued. And the Government attorney in this case addressed that decision (albeit not the section concluding that FBARs were not taxes) in a pleading (ECF #164) before the Magistrate-Judge issued her report and recommendations. Despite all this, the Government never altered its pleadings resulting in Judge Daniels' erroneous conclusion that FBARs constitute tax matters (S-A: 30, ftn. 7). Thus, the Government's error was not "inadvertent", pursuant to FRCP 60 (b) (1), but misrepresentation or misconduct falling squarely within FRCP 60 (b) (3). Also on point is 28 U.S.C § 530B (a) establishing that government attorneys "shall be subject to State Laws and rules", and Rule 3.3(a) (1) of the New York State Rules of Professional Conduct, part 1200, setting out that: "A lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."

### v. The District Court on applicability of the Hague Convention in this case: Legal issue or exercise of discretion?

19. Throughout its Response, the Government asserts that "the magistrate judge did not abuse her discretion because the Hague Convention is optional in the first

place." (see, for example, p. 45). It further claims that "[a]ssuming the Hague Convention did apply, however, the magistrate judge proceeded to use the comity test" (Response, p. 27). This deliberately misrepresents the Magistrate-Judge's decision. The title of the first section, "A", of the Order entitled "Discussion" is "**The Hague Convention does not apply to tax matters**" (SPA: 39). And in his subsequent Order granting summary judgement, Judge Daniels confirmed her conclusion that because this case involved tax issues and thus the Convention was not applicable in this case. (SPA: 30, ftn. 7).

20. In any case, the Magistrate-Judge's entirely *sua sponte* comity analysis did not grant the Government leave to depose me in France without prior consultation with the French authorities.

21. In conclusion on this point, the Government's reference to the applicability of the Hague Convention in this case as an exercise of discretion rather than an error of law does not withstand scrutiny.

**vi.  US law on the taking of depositions abroad**

22. As set out above, the Government Brief's silence on FRCP 28 and other relevant US Law speaks volumes. Although it cites the Supreme Court in *Aérospatiale* (*op. cit*) in support of its position that compliance with the Hague Convention is not necessary in each and every case, it fails to mention that the Supreme Court also held in that case that "oral depositions on foreign soil… are improper without

the consent of the foreign nation" (at 51, see, A: 41, para. 41). This is entirely consistent with FRCP 28 (b) (1), the Supreme Court 1812 decision in *Schooner Exchange v. McFaddon*, 11 U.S. 116, and the Justice Department's internal rules (see my Brief at paras. 21-22, 62-64).

23. The US Government is not a garden-variety litigant and thus its failure to comply with longstanding US law constitutes a particularly egregious error.

### vii) *Bittner* on FBARs and taxes

24. While the Government concedes that the Supreme Court in *Bittner* definitively held that FBARs are not tax matters, it cites a section of the *Bittner* judgement stating that unreported income discovered in FBARs may be subject to taxation separately under the terms of the Internal Revenue Code (Response, p. 45) in support of its argument that the District Court did not err in concluding that France would not consider the Hague Convention to be applicable in this case. First, the Government never raised this argument in litigation before the District Court. Moreover, the Bank Secrecy Act requires that penalties be recovered through ordinary civil proceedings, rather than administrative proceedings, as set out in *Mendu v. United States,* 153 Fed. Cl. 357, 365 (2021). My French attorney considered that provision, in particular, to be dispositive of France's position with respect to the applicability of the

Hague Convention on the Taking of Evidence in <u>Civil</u> and Commercial Matters (A: 86-88) in this case.

**viii. The French Evidence Law (or Blocking Statute)**

25. Given the Government's failure to comply with FRCP 28 (b)(1) and related law in this case, as well as its failure to provide any justification for this failure, France's blocking statute is essentially academic in this case.

26. In the event the Court disagrees, I observe that the Government never cited the Supreme Court in *Aérospatiale* on the issue of the French blocking statute in proceedings before the District Court nor did they cite *Motorola Credit Corp. v. Uzan*, 73 F. Supp. 3d 397, 403 (S.D.N.Y. 2014) (Rakoff, J.) or *In re Glob. Power Equip. Grp. Inc*., 418 B.R. 833, 849 (D. Del. 2009) (see Response 47-48) on France's enforcement of that Statute. Had it done so, I would have noted that all the cases cited by the Supreme Court in *Aérospatiale* on the permissive nature of the Hague Convention involved multinational corporate respondents rather than individuals, and that these cases did not grant leave to hold depositions abroad without the prior consent of the relevant national authorities. In any case, it is my belief and understanding that criminal proceedings against corporations are far more difficult to prosecute than cases against individuals, and that in any case, it is difficult to sentence a corporation to a term of imprisonment.

27. The Government further asserts that I "presented no evidence that the French blocking statute has ever been enforced in the context of a federal suit filed in the United States" (Response, p. 48). In her affidavit, my French attorney cited France's prosecution of *Christophe X* which cited involved the disclosure of information -in violation of France's Blocking Statute - in the context of US federal legal proceedings (A: 86-88).

28. Elsewhere the Government cites the Magistrate-Judge's conclusion that I could have travelled to another country that does not have a blocking statute (Response, p. 28 citing SPA: 43), a point that she raised *sua sponte*. Had the Government raised this point in its summary judgement pleadings I would have noted that the French Blocking Statute is binding on all French citizens wherever they are located just as the FBAR laws are binding on all US citizens, in the US and abroad.

29. As for the Government's argument that I could have obviated concerns regarding prosecution by agreeing to proceed in accordance with Article 17 of the Hague Convention (Response, p. 48), that position is simply irreconcilable with the District Court's decisions that the Hague Convention was inapplicable in this case rendering the possibility of proceeding in accordance Article 17 of the Convention moot.

30. In sum on this point, given the particular facts, sovereign interests and international comity, and the likelihood that proceeding in accordance with the Convention would have proven effective, this case is an emblematic example of circumstances militating in favor of proceeding in accordance with the Convention. Indeed, I consider it a grave injustice - as well as grievously undermining the efficient administration of justice - that when faced with an option to proceed in a manner that was consistent with both US and French law  that required merely sending a letter to France and waiting for a response (as initially agreed and ordered by the Court),  the Government instead took a u-turn that put me, one of its citizens, in legal jeopardy abroad thus resulting in extensive and onerous litigation.

### ix. Reasonable cause defenses-introductory issues

<u>Another matter raised for the first time on appeal</u>

31. The Government cites *Bittner (*op. cit*)* in support of its position that the "report [s]he eventually files accurately reflects each and every account" (Response, pp. 21, 40). This issue was never raised in District Court proceedings, and this is the first I have heard of this matter. Thus, it was impermissibly raised on appeal [See, *Wood v. Milyard* (op.cit)]. Further, the documents cited by the Government do not support its contention that my French accounts were not mentioned in my late filing.

32. The Government's claim that I "offered no evidence establishing that [I] had reasonable cause to miss the filing deadline for her FBARs" is simply untrue. I recall that in my response to the Government's summary judgement motion, I filed a Cross-Motion, pursuant to FRCP 15, seeking leave to amend my Answer to the Government's Order to raise two affirmative defenses (A: 54-58) and that this was denied by the District Court, meaning that I never had an opportunity to address the proposed affirmative defenses in any detail. Moreover, the District Court only addressed one of the affirmative defenses I intended to raise, namely, my reliance on my accountant. The Magistrate-Judge referenced my second defense - my accountant's difficulty in obtaining the relevant bank records which was referenced in paragraph 73 of the Government's Complaint against me- (A: 221) but did not otherwise address it in her Order.

The U.S Supreme Court in *Boyle*

33. In further support of its position, the government cites *United States v. Boyle, 469 U.S. 241, (1985)* which relates to a tax matter (Response, pp. 32, 41). As noted above, the Government itself now concedes that FBARs are not tax matters, and it is my view that the Court's reasoning with respect to taxes is not applicable to FBARs as not all financial reporting obligations are of equal notoriety. According to the Supreme Court in *Bittner*: "[w]e are even told that,

until 2008 and 2009, when the government began aggressively enforcing FBAR penalties, 'many experienced tax professionals and return preparers were not aware of the FBAR reporting obligations.'" Supreme Court Clarence Thomas' public defense of his failure to report certain gifts relied on the advice of anonymous "Supreme Court officers" and an assertion that "any prior reporting errors were strictly inadvertent."[3] Few Americans have foreign bank accounts, most Americans living abroad that I have met are not aware of FBAR obligations, the Supreme Court in *Bittner* observed that "U. S. persons maintain overseas financial accounts for a variety of legitimate reasons including convenience and access, and the Bank Secrecy Act was enacted to address tax evasion and money laundering (none of which I have been accused of). In sum, the Supreme Court's determination that everyone knows that taxes are to be filed is not true of FBARs.

34. In conclusion on this point, given that the District Court's decision to strip me of my affirmative defenses was based on multiple legal errors, I submit that it constituted an abuse of discretion.

**x. Preclusion of Affirmative Defenses**

<u>Willfulness</u>

---

[3] https://www.berkefarah.com/news/2023/8/31/elliot-s-berke-releases-statement-on-behalf-of-client-justice-clarence-thomas-1

35. In considering the willfulness issue, it is notable that the Magistrate-Judge's summary of the procedural history in her Order to Compel deposition is very much at odds with her eventual conclusions: "[b]oth Parties have stated in recent filings that Judge Fox set this lengthy discovery period specifically to allow time for discovery to proceed through the often-slow mechanisms of the Hague Convention… The Court held that, while the Hague Convention could not be utilized in Belgium, Plaintiff still had to go through formal discovery channels …. [During a Status Conference held seven months after that agreement] [t]he Court found that the Rule 26(f) discovery plan constituted an agreement by both Parties to proceed with discovery via the Hague Convention… Furthermore, the discovery plan as ratified by Judge Fox had specifically contemplated the time needed to comply with the Hague Convention…  Plaintiff had not taken any steps to comply with the Hague Convention at the time of the conference... As a consequence, Plaintiff was ordered to satisfy their obligations under the Hague Convention in order to take Defendant's deposition…. Surprisingly, at this late stage of the discovery process and the on-going disputes regarding use of the Hague Convention, Plaintiff raises the issue that the France might not even consider tax matters as a "civil or commercial matter" within the jurisdiction of the Convention." (S-A: 34-35).

36. The Government contends that I informed the Magistrate-Judge that I was "motivated" by a desire not to make the government's job easier and that she interpreted this as clear evidence of an intent to delay (Response, para. 49). Notably, the Magistrate-Judge cited the misstatement on which she relied in her Order to Compel *sua sponte* [see *United States v. Sineneng-Smith* (590 US__, 2020) on the adversarial nature of the US Legal system], without explaining her need to supplement the Government's submissions (SPA: 44)).

37. First, I misspoke 10 months after the parties had agreed to proceed in accordance with the Hague Convention and after the Government had failed to comply with two court orders to comply with the Convention. Far more importantly, the Magistrate-Judge failed to mention that immediately after the Status Conference at issue, I sent her a letter in which I stated: "Your Honor asked why I would not voluntarily consent to a deposition within the meaning of Article 17 of the Convention. In response, I misspoke… Both US and international law recognize my right to be deposed in accordance with the law of the country in which I am residing. I did not move abroad to avoid deposition in the United States; I have resided abroad for almost 30 years, and the Plaintiff has adduced absolutely no evidence that a deposition in accordance with the laws of France or Belgium is impossible… and at the risk of stating the obvious, had the Plaintiff proceeded in accordance with the

discovery plan adopted by Judge Fox, the deposition would almost certainly have taken place by now" [A: 425-426; ECF 121]. I also consistently informed the Magistrate-Judge at status conferences, including the one at issue, that I was ill-at-ease addressing matters of substance in oral proceedings and preferred to rely on written submissions (see for example, ECF 128, p. 10, lines 2-7).[4]

38. The Magistrate-Judge further failed to mention my repeated assertions that "I have never said that I would not sit for a deposition, I have only said that I would not do so in violation of the domestic laws of France (and/or Belgium)" (See, *Inter alia*, ECF #96, para. 2 and ECF #137, paras. 49-50, adding in the latter that: "[i]f it is this Court's position that good faith requires that I violate the domestic law of the country I am residing in, then it should say so explicitly").

39. With respect to the risks of prosecution in France and my desire to consult with a French attorney, the Government misrepresents the procedural history in this case. I did not focus on the Blocking Statute in response to its Motion to Compel as those pleadings focused on the applicability of the Hague Convention in this case. However, as set out in my Brief, after the Magistrate-

---

[4] "Yes, let me start, I think I've said this before in the past and I just want to say it again, I feel extremely uncomfortable doing, thinking on my feet in oral argument. I'm much more comfortable sitting back and thinking about things and putting them down in paper and then changing them as necessary."

Judge issued her Order to Compel in which she concluded that the deposition would take place outside processes of the Hague Convention process, and it was then that I felt compelled to consult a French attorney (despite the Magistrate-Judge's failure to give me time to do so, see my Brief, para. 83). My French attorney stressed the real dangers under French law of complying with the Order to Compel and advised against compliance. I advised the Magistrate-Judge of her advice in a letter (A: 51) and then transmitted an affidavit from my attorney confirming her counsel in response to the Government's Motion for Summary Judgement (A: 88). Thus, by the time of the decisions on Summary Judgement, both the Magistrate-Judge and Judge Daniels had before them compelling evidence that the Government's claim that the French did not prosecute violations of its Blocking Statute was false.

40. Further notable is that neither the Government nor the Court have ever addressed the additional risk of civil penalties resulting from a violation of the European Union's General Data Protection Regulation in a deposition held in Europe (see my Brief, paras. 14-15 and 55-56).

41. At the risk of repeating myself, had the Government complied with the two Court Orders to comply with Chapter I of the Hague Convention, the deposition would have taken place in compliance with American, French, and

European Law within the year provided for by the Magistrate-Judge in his
October 2021 Order (A:14).

42. As noted above, the Government's non-compliance with US law on the taking
of depositions abroad, was never addressed by the Government or the District
Court, and thus I believe that Government's approach, violating both US and
foreign law, with substantial potential consequences arising from the latter, is
a matter of first impression. No other cases cited by the Government cite
analogous circumstances.

43. In conclusion on this issue, given the circumstances of this case and this
circuit's case law (see my Brief, paras. 73-77) indicating that preclusion of
affirmative defenses is only warranted in exceptional circumstances where the
non-compliant party's approach is continuous, malicious and there had been
demonstrable prejudice to the opposing party, the Court's conclusion that my
non-compliance was willful is clearly "unjust." As FRCP   37(b)(2)(A)
requires that any sanctions imposed be "just", the District Court's error is one
of law not of discretion.

Lesser sanctions

44. The Government's claim that I attempted to "propose [my] own ideas" about
what would constitute appropriate lesser sanctions is silly (Response, p. 53).
As noted in my Brief (paras. 87-87), the lesser sanction that I suggested would

have been appropriate was raised by the Magistrate-Judge, not me. The Government also claims that any lesser sanction would have deprived it of asking me about my "possible defenses to learn what evidence she might rely on at summary judgment." As noted in my Brief, this argument is unavailing as the Government itself referred to the relevant defenses in their Complaint against me, and thus had the facts and relevant information in its possession (para. 102). It is my understanding that the purpose of depositions is to elicit facts and information not to inquire about how those facts and information might be used at trial.

Duration of Non-Compliance

45. In support of its position that the duration of the non-compliance was sufficient to warrant the imposition of sanctions, the Government cites *Funk v. Belneftekhim*, 861 F.3d 354, 368 (2d Cir. 2017). This case was never cited in the District court proceedings. Consequently, I did not have an opportunity to mention that in that case the non-compliant party was a corporate entity that had defied two court orders, including one requiring the payment of fines. Additionally, neither party was a pro se litigant. This case is therefore distinguishable on the facts.

46. With respect to my requests for an extension of time to consult with a French attorney (Response p. 54), I explained in my Brief [para, 83, including ftn. 14]

why I did not need to consult with a French attorney until after the Magistrate-Judge issued her order to compel. Her failure to understand this is such an injustice as to constitute an abuse of discretion.

### C. SERVICE OF PROCESS

47. Despite the Government's efforts to muddy the waters by conflating two separate District Court decisions, this issue could not be more straightforward. With respect to the substance of my motion for reconsideration and the submission of new evidence, the Government impermissibly argues for the first time on appeal that "although [I] supplemented the record with sworn testimony on [my] motion for reconsideration… none of that testimony was the type of 'newly discovered' evidence that can be introduced on such a motion" citing *Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 146 (2d Cir. 2020). More importantly, it engages in a wholesale misrepresentation of the District Court's decision. The District Court denied my Motion to dismiss on the basis of additional evidence on the basis that "[t]he additional evidence [I] move[d] to introduce are just additional sworn assertions that [I] lived in Switzerland at the time of service (SPA: 51-52]." It completely disregarded the additional newly discovered evidence that I had not had access to my father's apartment following his death over a year before the purported service (see my Brief, para. 117). Neither the District Court, in

its decision, nor the government, in its district court pleadings, cited *Metzler*, or the allegation that the new evidence adduced was not really new evidence. In sum, the Court's Order on service of process constituted a grave injustice.

48. The Government also claims that I forfeited my right to seek dismissal of the case on this basis. In support of its position, the Government impermissibly argues for the first time on appeal that I have forfeited this right, citing *Buon v. Spindler, 65 F.4th 64, 74* (2d Cir. 2023) and related cases on "submission through conduct," thus waiving or forfeiting its own right to rely on this argument on appeal.

49. Arguendo, that the Government had not forfeited this right to raise this matter on appeal, it once again disregards the procedural history in this case. The Complaint against me was filed on June 13, 2019 (ECF #1). Proceedings against me took place *in absentia* because I had not been properly served over the course of the following year culminating in the issuance of a Clerk's certificate of default one year later on June 15, 2020 (ECF #15). It is sheer coincidence that I learned of this case by googling my name as part of a course on digital investigations at about the same time and subsequently addressed the court (ECF #16). Thus, in addition to violating the FRCP (12) (b) and my rights, the Government's failure to properly serve me undermined the efficient administration of justice by requiring duplicative proceedings. Additionally,

penalties accrued during the period in which I was unaware of the proceedings.

50. Further, and at the risk of stating the obvious, having learned of the case via Google, had I not participated in the proceedings, the Court would merely have issued a certificate of default and seized assets belonging to me, and I would have been required to participate in extensive and costly litigation to recoup those assets. If it is this Court's position that I should have allowed all this to happen and then appealed, I believe that this is just the type of right that *pro se* litigants may inadvertently forfeit because they are unfamiliar with procedural issues. See *Tracy v. Freshwater* (*op. cit*).

51. The Government contends that "the district court rejected [my] contention that service was improper because [I] allegedly did not have access to the [my] father's apartment after [my] father's death in 2018" but only cites the initial decision on this issue dismissing this submission because it had not been sworn under penalty of perjury "under the laws of the United States".

52. The Government also misleadingly cites a 2012 deposition in support of its claim claiming that during that deposition I "confirmed that I maintained ongoing and permanent use of a Manhattan apartment" (Response, p. 21), evidence that the District Court did not rely on it. In addition to that deposition being outdated by the time of the proceedings before the District Court, what

I actually said in the deposition was that I would visit my father each year for "about two weeks in the summer... and one week in the wintertime" (ECF 37 #5, p. 146 lines 19-25 and p. 147 lines 2-7). This cannot be reasonably interpreted to constitute an admission of "permanent and ongoing use" of my father's apartment. More importantly, the Government had in its possession other both contemporaneous and more recent information in the form of tax returns, with my real current address abroad, indicating not only that I was living and working abroad with my minor-age son but that I had been doing so for over 330 days per year (ECF #55).

53. The Government's additional submissions on this issue are irrelevant as they address my initial Order on my motion. I understand that to be in response to the District Court's denial of my motion to reconsider its error in (New York) law by relying on hearsay evidence by an anonymous doorman in support of its conclusions that I had been properly served because the motion had been filed nine days out of time. The District Court did not rely on any of the Government's antiquated information in either of its Orders. It relied solely on the process server's affidavit.

**D. PRIVACY**

54. Despite the Government's efforts to complicate matters, this issue too is utterly straightforward. Although I repeatedly cited *United States v. Amodeo*,

"Amodeo II", 71 F.3d 1044, 1048 (2d Cir.1995) in my pleadings, the Court failed to balance my privacy rights against the public interest, resulting in a clear error of law, and not an issue of discretion as suggested by the Government. Moreover, given that I cited the case-law in both my initial pleadings, and in my pleadings seeking reconsideration, the only reasonable inference is that in failing to apply the relevant legal test, but nonetheless finding in the Government's favor, the joint purpose of the Government and the lower court was to publicly vex and embarrass me.

55. The Government refers to *Bernstein v. Bernstein Litowitz Berger & Grossmann* LLP, 814 F.3d 132, 139 (2d Cir. 2016) for the first time in its Brief on Appeal (p. 60). Had it raised it earlier, I would have observed that *Bernstein* is inapposite because it involves allegations that a law firm had engaged in unethical conduct, a matter which is clearly in the public interest, whereas this case involves my non-willful failure to comply with a financial reporting obligation.

56. The Government's also cites, for the first time on appeal, *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir. 2004) together with an argument about putting genies back in bottles (Response, p. 63). Had it referenced the case earlier, I would have noted that this case too has nothing to do with an

individual's non-willful failure to report personal financial information in a timely manner

57. More importantly, it is not too late to place this case under seal (my preference) or to redact confidential financial details that are not pertinent to the issues at bar. I could then ask search engines with offices in Europe to remove any relevant information from their search responses. It is unlawful to disseminate such confidential information in Europe. It is a crime in France,[5] and a civil violation pursuant to the European General Data Protection Regulation cited in my Brief (p. 23, para. 56). I cite this law which I understand is inapplicable in the United States for two reasons. First, because it seems to me that the United States is lagging on issues relating to privacy rights in the digital age (although public interest exception might have some merit where an individual has been found liable for money-laundering, private or public corruption, or tax evasion, but that is not the case here). Second, while the availability of such information online in Europe is unlawful, it is my understanding that US-based search engines are more responsive to the multitude of removal requests they receive, pursuant to European law, when accompanied by a Court order.

---

[5] Articles 226-13 and 226-14 of the French penal code (as cited by me in ECF #112)

## CERTIFICATE OF COMPLIANCE

58. I, Carolyn Buff, affirm that this opening brief complies with the requirements of F.R.A.P. 32(a)(7). According to the word count of the word processing system used to prepare it, it contains 6734 words (including footnotes), which is within the 7000 words established by Statute, as well as the 9000 words granted by the Court in response to a motion.

59. I also affirm that the contents of this Brief are true and accurate to the best of my knowledge.

Date: April 15, 2024

*Carolyn Buff*
_____
Carolyn Buff


Sworn before me, 15-04-2024